**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2753-15T3

MORETRAN REALTY, LLC,

    Plaintiff-Appellant,

v.

BALDEV PATEL AND SON,
LLC, BALDEV PATEL and
CHETAN PATEL,

    Defendants-Respondents.

_____

Argued February 14, 2017 — Decided August 23, 2017

Before Judges Messano and Espinosa.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-9032-14.

John R. Edwards, Jr., argued the cause for appellant (Price, Meese, Shulman & D'Arminio, PC, attorneys; Mr. Edwards, on the briefs).

Douglas J. Kinz argued the cause for respondent.

PER CURIAM

    Plaintiff Moretran Realty, LLC, purchased commercial real estate property (the Property) from defendant Baldev Patel and

Son, LLC (Seller) for $1.6 million. The parties agreed to escrow $100,000 for environmental issues pursuant to an escrow agreement that also required personal guarantees from defendants Baldev Patel and Chetan Patel (collectively the Patels).[1] This appeal concerns the disposition of the escrowed funds, each side claiming entitlement to the funds. Plaintiff appeals from an order that denied its motion for partial summary judgment and granted summary judgment to defendants, dismissing the complaint with prejudice. We affirm.

I.

When Seller purchased the Property in 2009, its commercial lender obtained a Phase I Environmental Assessment Report that identified two environmental issues on the Property. Both issues concerned contamination discovered after the removal of two 1,000-gallon underground heating oil storage tanks (UST) in 1999 and 2005.

Groundwater near the first UST was contaminated with gasoline constituents that were determined to have migrated from the adjacent U-Haul facility. Following remediation efforts under the supervision of the New Jersey Department of Environmental

_____

[1] Because they share the same surname, we refer to these defendants by their first names; we mean no disrespect.

Protection (NJDEP), the NJDEP issued a No Further Action (NFA) letter for the Property regarding the removal of this UST. The second UST was found to have leaked, resulting in soil and groundwater contamination. Following remediation efforts, NJDEP issued an NFA letter for this UST in 2009.

In March 2012, plaintiff entered into a contract with Seller to purchase the Property. During the ninety-day inspection period, plaintiff's attorney sent written notice to defendants that plaintiff elected to terminate the contract because it had "discovered various unacceptable conditions at the Property including . . . environmental areas of concern and significant defects in the structure of the building and its systems."

The environmental areas of concern (AOC) were identified in a report prepared by TRC Environmental Corporation (TRC) following its inspection of the Property.[2] TRC reported it had identified eighteen AOCs. It recommended "additional information or further investigation for" five AOCs:

| | |
|---|---|
| AOC 2c | Abandoned Fuel Oil UST (Unknown Capacity) |
| AOC 2d | Abandoned 2,500-Gallon #2 Fuel Oil UST |
| AOC 9 | Inactive Production Well |
| AOC 11 | Off-Site Impacts |
| AOC 12 | Debris Piles |

---

[2] The report provided in Plaintiff's appendix is titled, "Preliminary Assessment/Phase I Environmental Site Assessment Report" and is labeled "DRAFT" throughout.

TRC recommended "No Further Action . . . for the remaining AOCs." Among those were AOC 2a and AOC 2b, which referred to the 1,000 gallon USTs removed in 1999 and 2005, respectively, and which were the subjects of NFA letters from the NJDEP.

Plaintiff's counsel wrote a letter to defendant's attorney, dated June 25, 2012, that "confirm[ed] the terms upon which" plaintiff was willing to proceed with the sale. The letter set forth a number of modifications to the contract of sale, including:

> 1. The contract price is to be amended to $1,477,000.00. It is specifically understood and agreed that the [P]roperty is being sold physically, "as-is" except for the noted issues stated herein;
> 2. The sum of $100,000.00 will be escrowed at closing, to be held in trust by [S]eller's attorney, for environmental issues related to the two (2) underground storage tanks, and the contamination generally identified by U-Haul. The $100,000.00 shall be released upon the sooner of six (6) months from the closing or U-Haul assuming without reservation the clean-up of the subject [P]roperty. In the event that a Phase-I report by the lender shall reveal any additional environmental issues, the seller shall be entitled to cancel the contract unless the buyer waives the additional issues found. Additionally, [Baldev Patel and Chetan Patel] will personally hold [plaintiff] harmless from any environmental issues related to the two (2) underground storage tanks, and the contamination generally identified by U-Haul on the [P]roperty. The personal guarantees shall be released upon U-Haul assuming the clean-up as above referenced;

4

3. A phase I report must be accepted by [plaintiff's] lender so the transaction may be financed as contemplated;

4. The closing will be July 17, 2012, subject to the substantive and scheduling requirements of the lender; . . . .

[(Emphasis added).]

Both parties agree the closing occurred on September 11, 2012. The parties executed an escrow agreement that incorporated terms agreed upon in the June 25, 2012 letter:

[T]he parties have agreed that an escrow shall be established and an escrow agent shall be appointed to enable certain environmental work to be completed, as further described herein, and for [plaintiff] to receive the appropriate documentation of completion of the environmental work . . . .

2. Seller and [plaintiff] agree that the Escrowed Funds will be held in trust by the Escrow Agent, for environmental issues related to the two (2) underground storage tanks on the Property, and the contamination generally identified by U-Haul. The Escrowed Funds shall be released upon the sooner of six (6) months from the closing date, or U-Haul assuming without reservation the clean-up of the Property.

3. Baldev Patel and Chetan Patel jointly, severally and personally will hold [plaintiff] harmless from any environmental issues related to the two (2) underground storage tanks, and the contamination generally identified by U-Haul on the Property. The personal guarantees shall be released upon U-Haul assuming without reservation the clean-up of the Property.

5

According to a certification submitted by John Muchmore, the sole principal of plaintiff, "U-Haul took the position it was not responsible for any of the clean-up" after the closing. The parties extended time periods to further investigate the possibility that U-Haul would assume responsibility for the clean-up but U-Haul continued to deny any responsibility.[3] Plaintiff made numerous demands for defendants to take care of the clean-up; defendants refused to do so or release the escrowed funds for plaintiff to use for clean-up costs. Muchmore certified further "[t]he Property was contaminated at and prior to the . . . sale" and that "defendants are solely responsible for the costs" which plaintiff has incurred and will incur.

In the certification he submitted in opposition to plaintiff's motion, Chetan stated there was no contamination on the Property and no clean-up necessary at the time of the closing.

Remediation of the U-Haul site continued under the direction of Environmental Resources Management (ERM). In January 2013, ERM conducted groundwater sampling of eleven monitoring wells on the U-Haul site. Finding no excess levels of the gasoline constituents in wells close to the Property, ERM concluded there was no evidence

---

[3]  This assertion was not supported by any corroborating evidence and was disputed.

of any contamination migrating from the U-Haul site and that no clean-up was necessary on the Property.

When the six-month period expired, plaintiff's counsel requested an extension for ninety days. He also demanded the escrowed funds not be released and that Seller "immediately undertake the required clean-up, including . . . the groundwater remediation." A letter from plaintiff's counsel, dated April 5, 2013, confirms that defendants did not agree to the extension.

An email, dated July 26, 2013, from Alex Yankaskas, Vice President of Environmental Compliance Monitoring, Inc. (ECM), a licensed site remediation professional (LSRP), to plaintiff's counsel provided his interpretation of a report on groundwater sampling information from the U-Haul site. Yankaskas stated, "At this first, quick glance, this does not appear to support a strong contention relative to an off-site source migrating eastwardly." Although the email stated Yankaskas would take a more thorough look at the report, there is no evidence that his conclusion was altered by further review.

Plaintiff's counsel asserted that he and Yankaskas had conversations with defendants' former attorney, Bennett Wasserstrum, that purportedly reflected an agreement by defendants "to do the work they were obligated to do" regarding the site.

In an email relied upon by plaintiff dated March 26, 2014, Yankaskas states:

> I reached and spoke with Bennett Wasserstrum just now. He is onboard with our recent discussions. We will provide him a proposal this week for the borings.
>
> One point that came to mind relative to Patel vs. [plaintiff] as the client: The results will be the client's (whomever that may be) and therefore, there should be an agreement between the parties to share those findings.
>
> As part of that agreement, it would be prudent to add/confirm mutual objectives for the work, especially given the potential LSRP aspect (<u>if on-site contamination is confirmed</u>).
>
> [(Emphasis added).]

ECM presented the following Proposed Scope of Work:

> The proposed investigation will consist of a limited soil boring and ground water sampling program and associated reporting. This program is designed to assess general environmental conditions relative to two [USTs] previously removed from the site and potential gasoline groundwater contamination migrating from the adjacent (U-Haul) site.

A draft agreement prepared by plaintiff's attorney stated the parties agreed ECM would "conduct the investigation and take the LSRP position in remediating the [P]roperty as required by existing law." This agreement was never executed.

Plaintiff brought this action, seeking declaratory judgment pursuant to the Spill Compensation and Control Act, <u>N.J.S.A.</u> 58:10-

23.11 to -23.24, that defendants are jointly and severally liable for all investigatory, cleanup and removal costs and expenses and also seeking treble damages and indemnification. In addition, plaintiff alleged causes of action based on negligence, strict liability, nuisance, breach of contract and indemnification from the Patels pursuant to their personal guarantees. Defendants filed an answer and counterclaim in which they demanded judgment against plaintiff compelling the release of the escrowed funds. Plaintiff filed a motion for partial summary judgment, to compel the release of the escrowed funds for it to use for clean-up costs and to require the Patels to be liable for those costs. Defendant filed a cross-motion for summary judgment, seeking the dismissal of the complaint and release of the escrowed funds.

At oral argument, defense counsel argued plaintiff had produced no evidence of contamination to support its claims. Plaintiff contended such evidence existed, citing a reference in a certification from Wasserstrum to TRC's recommendation for "further investigation" regarding two USTs, AOC 2c and AOC 2d, one 2,500 gallon tank and the other of unknown capacity. In the certification, Wasserstrum maintained there was no contamination associated with these two tanks. He further asserted that plaintiff's concern and the subject of the escrow agreement were the two USTs removed from the Property in 1999 and 2005.

A-2753-15T3

The trial judge denied plaintiff's motion for partial summary judgment, granted defendants' cross-motion for summary judgment and set forth her reasons on the record. She stated:

> Plaintiff has conceded that U-Haul refused to assume responsibility for any cleanup of the [P]roperty since its testing revealed no evidence of ongoing contamination and the need for any such cleanup. Accordingly, more than six months have passed from the closing date, under the express language of the agreement . . . the escrow funds must be released.

The trial judge also noted the existence of evidence to support the conclusion that there was no contamination on the Property and the absence of evidence to the contrary.

In its appeal, plaintiff argues summary judgment should not have been granted[4] because there were genuine issues of material fact (Point I), the matter was not ripe for summary judgment (Point II) and the trial judge erred in making factual determinations based on information that related to the U-Haul site rather than to the Property (Point III). After reviewing these arguments in light of the record and applicable principles of law, we conclude they lack merit and further, the arguments raised in Points II and III require no discussion. R. 2:11-3(e)(1)(E).

---

[4] Plaintiff has not argued the trial judge erred in denying its motion for partial summary judgment.

A-2753-15T3

In reviewing a decision on a summary judgment motion, we view the evidence "in the light most favorable to the non-moving party," Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995), to determine whether the competent evidential materials presented "show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law," R. 4:46-2(c).[5]

In Cortez v. Gindhart, 435 N.J. Super. 589 (App. Div. 2014), certif. denied, 220 N.J. 269 (2015), we described the proofs necessary to defeat a motion for summary judgment:

> [T]he opponent must "'come forward with evidence' that creates a genuine issue of material fact." "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact."

---

[5] Plaintiff was required and did not support its motion with a statement of material facts that includes

> a citation to the portion of the motion record establishing the fact or demonstrating that it is uncontroverted. The citation shall identify the document and shall specify the pages and paragraphs or lines thereof or the specific portions of exhibits relied on.
>
> [Rule 4:46-2(a).]

> Although we must view the "evidential materials . . . in the light most favorable to the non-moving party" in reviewing summary judgment motions, we emphasize that it is <u>evidence</u> that must be relied upon to establish a genuine issue of fact. "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'"
>
> [<u>Id.</u> at 605 (citations omitted).]

The issues presented by this appeal concern a question of law, the interpretation of the escrow agreement language, and a question of fact, whether the evidence supported the disbursement of the escrowed funds to Seller.[6]

### A.

Because the interpretation of a contract is a question of law, our review is de novo. <u>Kieffer v. Best Buy</u>, 205 <u>N.J.</u> 213, 222 (2011). "The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." <u>Id.</u> at 223. Contractual terms should be read and interpreted by using "their plain and ordinary meaning." <u>M.J. Paquet, Inc. v. N.J. Dep't of Transp.</u>, 171 <u>N.J.</u> 378, 396 (2002). However, "[i]f the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists," <u>Chubb Custom Ins. Co. v.</u>

---

[6] Defendants concede that their agreement to indemnify plaintiff survives the dismissal of plaintiff's complaint.

Prudential Ins. Co. of Am., 195 N.J. 231, 239 (2008), and extrinsic evidence may be used to discern the parties' intent, Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 270 (2006).

Neither party contends the language of the escrow agreement is ambiguous and we agree. The funds were explicitly "held in trust . . . for environmental issues related to the two (2) underground storage tanks on the Property, and the contamination generally identified by U-Haul." The escrow agreement also established the criteria for the release of the escrowed funds: "The Escrowed Funds shall be released upon the sooner of six (6) months from the closing date, or U-Haul assuming without reservation the clean-up of the Property."

The parties agree the closing occurred on September 11, 2012. It is also undisputed that U-Haul never assumed responsibility for a clean-up of the Property and, in fact, affirmatively disclaimed any responsibility for a clean-up. Contrary to plaintiff's assertion, there is no evidence in the record that defendants agreed to an extension of the six-month period. Therefore, the escrow agreement provided for the release of the escrowed funds at the end of the six-month period.

B.

Plaintiff contends summary judgment should not have been granted because it presented evidence in the form of "the no

further action letter, the TRC report and the proposed scope of work to be done sent on March 31, 2014" that established a genuine issue of fact as to the existence of contamination on the Property. We disagree.

As we have noted, the escrow agreement called for the release of funds no later than six months after the closing. The discovery of any contamination on the Property thereafter would not, therefore, have any bearing on whether the escrowed funds should be released. Plaintiff has produced no evidence of any contamination from "the two (2) underground storage tanks on the Property, and the contamination generally identified by U-Haul" within that six-month period. The ERM tests done in January 2013 found no evidence of any contamination migrating from the U-Haul site, the basis for U-Haul's conclusion that no clean-up was necessary on the Property. Plaintiff has presented no evidence that refutes that conclusion within the six-month period.

Even if we review the record beyond the six-month period, plaintiff has still produced no evidence of actual contamination relating to the issues identified in the escrow agreement. At best, plaintiff has produced a proposal from ECM to conduct investigative borings. But even in making the proposal in March 2014, Yankaskas referred to activity that would occur "_if_ on-site contamination is confirmed." (Emphasis added). Thus, even a year

after the escrow period had expired, there was no proof of contamination relating to the USTs referenced in the escrow agreement or contaminants that had migrated from the U-Haul site.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2753-15T3